IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JAMES E. NELSON,

      Plaintiff,

v.                                            Civil Action No. 3:20cv803

L. ELLIS, *et al.*,

      Defendants.

## MEMORANDUM OPINION

James E. Nelson, a diabetic, Virginia inmate proceeding *pro se*, filed this 42 U.S.C. § 1983 action.[1] The action proceeds on Nelson's Complaint ("Complaint," ECF No. 1). Nelson contends that, *inter alia*, the deliberate indifference of the defendants[2] resulted in the loss of "3/4 of the first toe of his left foot by amputation" in violation of the Eighth Amendment.[3] (*Id.* at 3.) Nelson raises the following grounds for relief:[4]

    Claim 1    L. Ellis failed to order the antibiotics ordered by Dr. Warner, which resulted in the amputation of a portion of Nelson's toe. (*Id.* at 10–11.)

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system to the parties' submissions. The Court corrects the spelling, punctuation, and capitalization and omits the emphasis in quotations from the parties' submissions. The Court omits any secondary citations in the quotations from the parties' submissions.

[2] Nelson names the following individuals as defendants: L. Ellis, a pharmacy nurse at Lawrenceville Correctional Center ("LVCC"); C. Harris, the Health Service Administrator for LVCC; Nurse N. Preston; Nurse Willoughby; Nurse B. Pennington; Nurse R. Jones; Head Nurse Sandra Lockhart; B. Russell; Correctional Officer L. Perkins-Walker; and, Global Experts and Outsourcing, Inc. ("GEO"). (ECF No. 1, at 1.)

[3] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

[4] The Court has placed in bold the names of the defendants who have moved for summary judgment. Nelson has not served the other defendants.

| | |
|---|---|
| Claim 2 | **GEO** failed to warn Nelson in December of 2019 that the water at LVCC was unsafe. (*Id.* at 11–12.) "As a direct result of Nelson showering in contaminated water infecting the open chronic ulcer of the first toe of Nelson's left foot, caused ¾ [of the toe] to be amputated." (*Id.* at 11–12.) |
| Claim 3 | Between November 8, 2019 and December 19, 2019, Harris, **Preston**, Willoughby, **Pennington**, and Jones ignored Nelson's requests to see the doctor which resulted in the amputation of a portion of his toe. (*Id.* at 12–13.) |
| Claim 4 | Lockhart, **Russell**, and **Pennington** refused to provide Nelson with an adequate amount of gauze, which resulted in the amputation of a portion of Nelson's toe. (*Id.* at 13–14.) |
| Claim 5 | After Dr. Warner directed that Nelson be transported to the Emergency Room on December 19, 2019, **Perkins-Walker** initially refused to comply with that directive because Nelson was not wearing the appropriate shoes. (*Id.* at 7.) **Perkins-Walker's** action amounted to deliberate indifference to Nelson's medical needs. (*Id.* at 15–16.) |
| Claim 6 | Since February of 2020, **GEO** has denied and delayed Nelson medical treatment by refusing to send Nelson to an orthopedic doctor "to have his diabetic boots corrected or changed." (*Id.* at 17.) |

Nelson demands monetary damages. (*Id.* at 23.)

The matter is before the Court on the Motion for Summary Judgment filed by Preston, Pennington, Russell, Perkins-Walker, and GEO (collectively, "Defendants"). (ECF No. 39.) Defendants argue that Nelson's claims against them should be dismissed because, *inter alia*, he failed to properly exhaust his administrative remedies. Nelson was provided with appropriate *Roseboro*[5] notice and has responded.[6] For the reasons set forth below, the Motion for Summary

---

[5] *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975).

[6] Nelson has moved for an extension of time to respond to the Motion for Summary Judgment. Nelson's Motion for an Extension of Time (ECF No. 58) will be GRANTED and the Court will consider the responses to the Motion for Summary Judgment he has filed, (ECF No. 59).

Judgment will be GRANTED because Nelson failed to properly exhaust his administrative remedies.

### I. Nelson's Requests for Discovery

On June 10, 2021, Nelson filed his First Motion for Production of Documents. (ECF No. 27.) Nelson requested the following documents from Defendants: "(1) prison work record; (2) lawsuits filed against Defendants; (3) reprimands for misbehavior; (4) grievances filed by inmates against Defendants; (5) grievances filed by staff against Defendants; (6) training; (7) performance reviews; and (8), any other information Defendants or any person(s) agencies have relative to this civil rights action." (ECF No. 28, at 1–2.)

On June 25, 2021, Nelson filed his Second Motion for Production of Documents. (ECF No. 31.) Nelson requested that Defendants produce his prescription records and pharmacy records showing that those prescriptions were filled. (ECF No. 32, at 1–2.)

Thereafter, on August 13, 2021, Nelson filed three Motions for an Order Compelling Discovery. (ECF Nos. 34–36.) In his First Motion for an Order Compelling Discovery, Nelson seeks to compel Defendants Ellis, Harris, Lockhart, Willoughby, Jones, Preston, Russell, Pennington, and, Perkins-Walker to answer a variety of interrogatories. (ECF No. 35, at 1.) In his Second Motion for an Order Compelling Discovery, Nelson seeks to compel Defendants to provide the documents sought in his First Motion for Production of Documents. (ECF No. 36, at 1.) In his Third Motion for an Order Compelling Discovery, Nelson seeks to compel Defendants to provide the documents sought in his Second Motion for Production of Documents. (ECF No. 36, at 1.)

Defendants responded, *inter alia*, that many of the documents Nelson seeks were provided as attachments to their Motion for Summary Judgment and that much of his sought

3

after discovery is irrelevant and has no bearing on the claims before the Court. (*See* ECF No. 42.) Defendants "ask the Court to defer any further discovery until after the pending motion for summary judgment has been decided." (*Id.* at 7.)

Nelson seeks discovery regarding the merits of his case. However, no discovery is sought or needed regarding Nelson's failure to properly exhaust his administrative remedies, which is plain on the face of the record. *Rawlins v. Marlow*, 2:19cv01905, 2020 WL 4482765, at *6 (W.D. Wash. July 6, 2020) (denying motion to compel under similar circumstances), *report and recommendation adopted*, No. 2:19cv01905, 2020 WL 4465974 (W.D. Wash. Aug. 4, 2020). Accordingly, Nelson's Motions regarding discovery from Defendants (ECF Nos. 27, 31, 34–36) will be DENIED.

## II. Summary Judgment Standard

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility to inform the court of the basis for the motion, and to identify the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c) and 56(e) (1986)).

In reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a mere scintilla of evidence will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (citing *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

Defendants asks the Court to dismiss Nelson's claims because Nelson failed to exhaust his administrative remedies as required by 42 U.S.C. § 1997e(a). Because the exhaustion of administrative remedies is an affirmative defense, Defendants bear the burden of pleading and proving lack of exhaustion. *Jones v. Bock*, 549 U.S. 199, 216 (2007). As pertinent here, in support of their Motion for Summary Judgment, Defendants submit: (1) Nelson's institutional record, including his grievance record and his medical record (ECF Nos. 40-1 through 40-4); (2) the declaration of Michael Breckon, the Facility Administrator at LVCC (ECF No. 40-5); (3) the declaration of Dr. Samuel Esochaghi, the Medical Director of LVCC (ECF No. 40-8); (4) a copy of Operating Procedure 866.1, Offender Grievance Procedure ("Operating Procedure § 866.1," ECF No. 40-9); and, (5) the declaration of Christy Jones, the acting Institutional Grievance Coordinator at LVCC (ECF No. 40-10). In response, Nelson submitted, among other things,

5

several affidavits from himself and other inmates (*see, e.g.*, ECF Nos. 1-2,[7] 1-3, 54-1, at 2–16), grievance material (ECF No. 1-4, at 1–11) and a host of other documents.

In light of the foregoing principles and submissions, the following facts are established for the purposes of the Motion for Summary Judgment. All permissible inferences are drawn in favor of Nelson.

### III. Relevant Facts

#### A. Background Regarding Nelson and His Medical Claims

"Nelson is a 68-year-old inmate who suffers from insulin dependent diabetes mellitus. Diabetic foot is a condition commonly experienced by persons suffering from diabetes, including Nelson." (ECF No. 40-8, at 1.)

> Diabetic foot compromises the body's ability to repair injury or trauma to the foot. . . . Vascular disease undermines the bodies' ability to heal itself. Consequently, it takes longer for a sore or cut to heal and the foot becomes especially susceptible to infection. Severe infection can lead to sepsis or gangrene.

(*Id.* at 2.) "Diabetics are counseled to pay attention to and care for their feet to prevent foot infection." (*Id.*) "Nelson has a long history of foot ulcers related to his diabetic condition." (*Id.*)[8]

---

[7] Nelson swears that, "I have exhausted all administrative remedies . . . as required by the Prison Litigation Reform Act (PLRA)." (ECF No. 1-2, at 1.) However, Nelson's "[a]iry generalities [and] conclusory assertions" that he exhausted his administrative remedies "[do] not suffice to stave off summary judgment." *McManus v. Wilson*, No. 3:13CV460, 2015 WL 3444864, at *6 (E.D. Va. May 28, 2015) (alterations in original) (quoting *United States v. Roane*, 378 F.3d 382, 400–01 (4th Cir. 2004)).

[8] Medical staff observed ulcers on Nelson toes on January 30, 2018, September 19, 2018, October 8, 2018, and April 15, 2019. (ECF No. 40-8, at 2.) These ulcers resolved by May 20, 2019. (*Id.* at 3.)

6

On November 6, 2019, Dr. Warner examined Nelson in conjunction with Nelson's chronic disease follow-up appointment. (*Id.* at 3.) "Dr Warner observed a large callus on Nelson's left first toe with an adjacent ulcer 1.5 x 1.5 cm in size. Dr. Warner noted that the ulcer was clean and was not draining. He noted that Nelson was keeping the ulcer dressed and clean." (*Id.*) On November 7, 2019, Dr. Warner prescribed Thera Derm for Nelson. (ECF No. 1-3, at 1.) "Thera Derm lotion is not an antibiotic cream. This moisturizing lotion was not prescribed to treat cellulitis or infection but was instead prescribed as preventative therapy to promote skin integrity." (ECF No. 40-8, at 3.)[9]

"Insulin dependent diabetics like Nelson make daily visits to the LVCC medical department to receive insulin. Diabetic call is a busy time of day for the LVCC Nurses engaged in this process." (*Id.* at 7.) During diabetic call, nurse are not available to address general health complaints and inmates voicing medical complaints "are frequently instructed to follow procedure by submitting a sick call request." (*Id.*) Between November 8, 2019 and December 19, 2019, when Nelson told the LVCC nurses that he needed to see a doctor because of an ulcer on his foot, he was repeatedly instructed to submit a sick call request. (ECF No. 1-3, at 2.) Nelson responded that he had submitted multiple sick call requests and had not received a response. (*Id.*)[10]

Nelson was next seen in the medical department on December 19, 2019. (ECF No. 40-8, at 3.) Dr. Warner asked Nelson if he had received the antibiotics that had been prescribed on

---

[9] Although Nelson received Thera Derm, it is unclear whether Dr. Warner prescribed antibiotics for Nelson on November 7, 2019 and whether Nelson received antibiotics immediately after November 7, 2019.

[10] According to Defendants' evidence, "[t]here is no record that Nelson submitted sick call requests that were simply ignored during November and December 2019." (ECF No. 40-8, at 7.)

7

November 7, 2019. (ECF No. 1-3, at 3.) Nelson responded, "No." (*Id.*) After a physical exam at 10:34 a.m., "Dr. Warner ordered that Nelson be transported to the Community Memorial Hospital ("CMH") emergency room to receive intravenous antibiotics" for an infection of his toe. (ECF No 40-8, at 3–4.)

> As of Dr. Warner's examination at 10:34 a.m., Nelson exhibited streaking associated with the systemic spread of Nelson's infection beyond his ulcerated toe. This is a disease process that manifests over days, not minutes or hours. At this point, the disease process had advanced to a degree that Nelson's great toe amputation was likely inevitable.

(*Id.* at 4.)

"At 11:00 a.m., Nurse Janifer contacted the CMH emergency room and LVCC transport officers to advise both cohorts of Nelson's impending transfer." (*Id.*) Nevertheless, Nelson's departure from LVCC was delayed by Correctional Officer Perkins-Walker because Nelson was not wearing the appropriate shoes. (ECF No. 1-3, at 4.) Eventually, Captain Edwards allowed Nelson to leave LVCC despite his footwear. (*Id.* at 5.)

Nelson's medical records do not reflect the exact time he arrived at CMH. (ECF No. 40-8, at 4.)

> However, his records reflect that his ulcerated great toe and blood was cultured sometime prior to 1:37 p.m. Without accounting for security protocols prior to transport, once the inmate is secured with the transport vehicle, the drive to CMH takes approximately 30 minutes.

(*Id.*) "The timing of Nelson's transportation to the CMH emergency room did not significantly affect the prognosis for his great toe." (*Id.*)

At CMH, Nelson was placed on intravenous antibiotics and his foot was x-rayed. (ECF No. 1_3, at 5.) Thereafter, Nelson's left great toe was amputated. (ECF No. 40-8 at 5.) On December 21, 2019, Nelson was discharged from CMH and with a prescription for oral antibiotics. (*Id.*; ECF No. 1-3, at 5.)

### B. The Boil Water Advisory

On December 17, 2019, the Town of Lawrenceville and the North Brunswick Industrial Development Authority issued a boil water advisory ("Advisory") to all residents in response to a repair of a water leak. (ECF No. 40-5, at 1–2.) In response to the Advisory, correctional staff notified inmates at the LVCC of the Advisory and provided safe, "pouch water for drinking." (*Id.* at 2.) The Advisory was lifted on December 19, 2019. (*Id.*) "Fortunately, there was apparently no drinking water contamination resulting from this water leak and associated repairs." (*Id.* at 3.)

### C. Grievance Procedure at the Virginia Department of Corrections ("VDOC")

Offenders receive an orientation to the grievance procedure system when they arrive at a VDOC facility. (Operating Procedure § 866.1.IV.A.4.) Operating Procedure § 866.1 requires that, before submitting a formal grievance, the inmate must demonstrate that he or she has made a good faith effort to resolve the grievance informally through the procedures available at the institution to secure institutional services or resolve complaints. (*Id.* § 866.1.V.A.) Generally, a good faith effort requires the inmate to submit an informal complaint form. (*Id.* § 866.1.V.A.1–2.)

"The original *Regular Grievance* (no photocopies or carbon copies) should be submitted by the offender through the facility mail system to the Facility Unit Head's Office for processing by the Institutional Ombudsman/Grievance Coordinator." (*Id.* § 866.1.VI.A.2.b.) The offender must attach to the regular grievance a copy of the informal complaint or other documentation demonstrating their attempt to informally resolve the issue. (*Id.* § 866.1.VI.A.2.a.) Additionally, "[i]f 15 calendar days have expired from the date the *Informal Complaint* was logged without the offender receiving a response, the offender may submit a *Grievance* on the issue and attach the

9

*Informal Complaint* receipt as documentation of the attempt to resolve the issue informally." (*Id.* § 866.1.V.A.3.) A formal grievance must be filed within thirty days from the date of the incident or occurrence, or the discovery of the incident or occurrence, except in instances beyond the offender's control. (*Id.* § 866.1.VI.A.1.)

### 1. Grievance Intake Procedure

Prior to review of the substance of a grievance, prison officials conduct an "intake" review of the grievance to assure that it meets the published criteria for acceptance. (*Id.* § 866.1.VI.B.) For example, as pertinent here, "[o]nly one issue per grievance form will be addressed. The offender is to write the issue in the space provided on the *Regular* Grievance, preferably in ink." (*Id.* § 866.1VIA.2.a.) A grievance meeting the criteria for acceptance is logged in on the day it is received, and a "Grievance Receipt" is issued to the inmate within two days. (*Id.* § 866.1.VI.B.3.) If the grievance does not meet the criteria for acceptance, prison officials complete the "Intake" section of the grievance and return the grievance to the inmate within two working days. (*Id.* § 866.1.VI.B.4.) If the inmate desires a review of the intake decision, he or she must send the grievance form to the Regional Ombudsman within five calendar days of receipt. (*Id.* § 866.1.VI.B.5.) "If a Regular Grievance does not meet the criteria for acceptance and review by the Regional Ombudsman does not result in intake into the grievance process, the issue must be resubmitted in accordance with the criteria for acceptance." (*Id.* § 866.1.IV.O(b).) Finally, "[t]he exhaustion of remedies requirement will be met only when the Regular Grievance has been accepted into the grievance process and appealed through the highest eligible level without satisfactory resolution of the issue." (*Id.*)

**2. Grievance Appeals**

Up to three levels of review exist for a regular grievance. (*Id.* § 866.1.VI.C.) The Facility Unit Head of the facility in which the offender is confined is responsible for Level I review. (*Id.* § 866.1.VI.C.1.) If the offender is dissatisfied with the determination at Level I, he or she may appeal the decision to Level II, a review of which is conducted by the Regional Administrator, the Health Services Director, the Superintendent for Education, or the Chief of Operations for Offender Management Services. (*Id.* § 866.1.VI.C.2.) The Level II response informs the offender whether he or she "qualifies for" an appeal to Level III. (*Id.* § 866.1.VI.C.2.g.)

**C. Nelson's Pertinent Efforts at Exhaustion with Respect to His Present Claim**

On December 27, 2019, Nelson filed five (5) informal complaint forms. (ECF No. 40-10, at 2; ECF No. 1-4, at 7–11.)[11] Nelson contends that this was a single complaint that stretched over five informal complaint forms. (ECF No. 65, at 15.) Because Nelson failed to receive a timely response to his informal complaint(s), on January 15, 2020, he filed a grievance pertaining to his medical care that stretched over three grievance complaint forms. (ECF No. 1-4, at 1, 3, 5.)[12] Nelson attempted to indicate that he was filing a single grievance by writing on the top of each form, "1 of 3," "2 of 3," and, "3 of 3." (*Id.*)

---

[11] The informal complaint forms in the record are largely illegible. (ECF No. 1-4, at 7–11.)

[12] On January 28, 2020, Health Services Manager Yarger issued a tardy response collectively to the informal complaint(s) as follows:

> I have reviewed your record. Our records indicate that you received 14 tabs of Bactrim DS for a seven-day regimen on 12/21/19. The day prior to writing this complaint, it appears as though the facility physician sent you to the local emergency room for treatment of your toe due to your condition diabetes. Our records indicate that you followed up with the physician on 1/17/20 and again on 1/21/20 for review and treatment. I will speak with nursing staff regarding the issuance of basic dressing supplies. Please let me know if this issue persists.

On the first grievance form, Nelson stated:

> Because of deliberate indifference, gross negligence, wantoness and reckless endangerment to my health and safety by GEO, Inc., Nurse Lockhart, Russell, Preston, Pennington, Willoughby, R. Jones, and Ellis, Pharmacy Nurse, caused me to lose 2/3 of my big toe on my left foot.
> Ellis, Pharmacy Nurse, refused to order antibiotics Dr. Warner ordered. I am a diabetic and three times a day I asked the above nurses to see the doctor and for gauze and tape to wrap my toe. I also filed (3) requests to see the doctor.

(*Id.* at 1.) On the second grievance form, Nelson stated,

> Nurse Russell went off on me, telling me she would not give me gauze and tape because her boss, Lockhart.
> Nurse Pennington only gave me a small piece of gauze and tape wrapped around a paper clip.
> November 19, 2019, after showering in water I later learned was contaminated, my big toe turned bright red and swollen and my ankle and leg were swollen. I showed this to Nurse Jones, who said come back the next day and she would be sure I saw the doctor. November 20, 2019, Dr. Warner asked if got the antibiotics he ordered from before. I told him, "No." Dr. Warner immediately sent me to the South Hill VCU. LVCC staff did not move fast enough and South Hill called wanting to know why I was not there.

(*Id.* at 3.)[13] On the third grievance form, Nelson stated,

> At the hospital, I was immediately given antibiotics by IV. The doctor said it would take 10–12 days to possibly cure my toe that way, but he couldn't guarantee anything. The doctor said it was so bad and spread through my foot and leg, to save them I needed my toe amputated now.
> The combination of contaminated shower water, Ellis Pharmacy Nurse refusing to order antibiotics that Dr. Warner ordered, the nursing staff hindering and delaying me seeing the doctor and refusing to give me gauze and tape to keep the small place on my toe clean caused it to fester out of control which caused me to lose 2/3 of my big toe unnecessarily.
> This is a violation of Va. Const. Article 1, Section 9 and U.S. Const. 8th Amendment.
> I intend to prosecute.

(*Id.* at 5.)

---

(ECF No. 40-10, at 2–3; ECF No. 40-1, at 1.)

[13] The Court assumes Nelson's reference to November on the second grievance form is a scrivener's error and he meant December. Nevertheless, this mistake certainly made it more difficult for prison officials to address his variety of complaints.

12

On January 27, 2020, Christy Jones, the Institutional Grievance Coordinator at LVCC, rejected each of the grievance forms at intake and marked on the back of each grievance form, "More than one issue – resubmit with only one issue." (*Id.* at 2, 4, 6.) "Nelson could have cured this problem by resubmitting a proper Regular Grievance." (ECF No. 40-10, at 3.)

Instead, Nelson attempted to appeal the intake decisions to the Regional Ombudsman. The appeal was stamped received in the Regional Ombudsman's Office on February 10, 2020. (*Id.* at 1, 3, 5.) The Regional Ombudsman rejected the appeals because the "5 day time limit for review has been exceeded." (*Id.* at 2, 4, 6.)

Nelson did not pursue any other grievances pertinent to the claims in this action, prior to the initiation of this action. (ECF No. 40-1, at 1–4.)

### IV. Exhaustion Analysis

The pertinent statute provides: "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This language "naturally requires a prisoner to exhaust the grievance procedures offered, whether or not the possible responses cover the specific relief the prisoner demands." *Booth v. Churner*, 532 U.S. 731, 738 (2001). Generally, in order to satisfy the exhaustion requirement, an aggrieved party must file a grievance raising the claim and pursue the grievance through all available levels of appeal, prior to bringing his or her action to court. *See Woodford v. Ngo*, 548 U.S. 81, 90 (2006). The Supreme Court has instructed that section 1997e(a) "requires proper exhaustion." *Id.* at 93. The Supreme Court explained that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules," *id.* at 90, "so that the agency addresses the issues on the merits." *Id.* (quoting

13

*Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). The applicable prison rules "define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007). Exhaustion is mandatory, and courts lack discretion to waive the exhaustion requirement. *Porter v. Nussle*, 534 U.S. 516, 524 (2002).

Nevertheless "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (citing *Aquilar–Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006)). The Supreme Court has explained that an administrative remedy is considered unavailable when: (1) "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 578 U.S. 632, 643–44 (2016).

"When an administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion." *Id.* at 644. The United States Court of Appeals for the Seventh Circuit quoted the foregoing language to conclude that, when "refiling" an initially defective grievance, "was available to [an inmate, the inmate's] failure to exhaust is not excusable." *Haywood v. Baylor*, 804 F. App'x 401, 403 (7th Cir. 2020) (citing *Kaba*, 458 F.3d at 684); *accord Wall v. Stevens*, No. 7:16cv00373, 2019 WL 1371858, at *4 (W.D. Va. Mar. 26, 2019), *aff'd*, 775 F. App'x 761 (4th Cir. 2019); *see Woodford*, 548 U.S. at 90 (emphasis added) (internal quotation marks omitted) (emphasizing that proper exhaustion entails "using *all* steps that the agency holds out"); *Steiskal v. Lewitzke*, 553 F.

App'x 611, 616 (7th Cir. 2014) (concluding inmate failed to exhaust administrative remedies where "[h]e submitted no evidence that prison staff prevented him from resubmitting his grievance or that he was incapable of doing so. His subjective belief that he was being thwarted was insufficient to create a genuine issue of material fact." (citation omitted)); *Wilson v. Jamrog*, No. 98-2281, 2000 WL 145455, at *2 (6th Cir. Feb. 1, 2000).

Nelson failed to file any grievance related to Claim Six. Accordingly, Claim Six will be DISMISSED WITHOUT PREJUDICE.

Nelson failed to comply with the VDOC's procedural rules for the grievance he filed with respect to the remaining claims. Those rules required that Nelson limit himself to a single issue per grievance. This rule is hardly draconian or unusual. *See Moore*, 517 F.3d at 729.[14]

---

[14] In *Moore*, the inmate disputed the conclusion that he had not properly exhausted his claim for inadequate medical care for his gout. 517 F.3d at 729. Moore had filed a grievance that referenced his gout, but it also referenced several other incidents and was rejected. *Id.* The Fourth Circuit concluded that the rejection of that grievance did not render administrative remedies unavailable to Moore. *Id.* In reaching that conclusion, the Fourth Circuit observed:

> Moore's first gout grievance also contained, *inter alia*, a complaint that a nurse attempted to use a prison officer to collect a urine sample that was to be analyzed for a regular physical examination. The grievance requested that the prison consider all of the facts alleged therein to be a single incident showing a pattern of inadequate medical care fueled by retaliatory motives. Indeed, Moore now argues that because he wasn't allowed to include the two complaints in the same grievance, he was prevented from showing a pattern of deliberate indifference. Simply stated, though, it is hard to see how Moore's claim that a nurse attempted to have an officer collect a urine sample has anything to do with a possible pattern of deliberate indifference toward Moore's medical needs. Thus, we conclude that the rejection of the grievance as violating the rule prohibiting a single grievance from being used to complain of two separate incidents certainly was well founded.

*Id.*; *but see id.* at 730 (concluding prison authorities improperly rejected grievance for referencing multiple incidents of retaliatory punishment because "requiring Moore to grieve each of the alleged components of his punishment separately would have prevented him from fairly presenting his claim in its entirety").

15

Moreover, in the wake of *Ross*, it is not possible to characterize the rejection of his multipage grievance complaining about, *inter alia*, contaminated shower water, inadequate provision of gauze, missed prescriptions, and a delay in transport to the hospital, as an inappropriate effort by "prison administrators [to] thwart [Nelson] from taking advantage of a grievance process through machination . . . ." *Ross*, 578 U.S. at 644 (citation omitted).

Further, the rejection of Nelson's grievance did not render the administrative process unavailable because Nelson had ample opportunity, and was in fact encouraged, to resubmit separate grievances addressed to each of the incidents of which he now complains. *See Haywood*, 804 F. App'x at 403 (citing *Kaba*, 458 F.3d at 684). Because he failed to do so, his complaint was not addressing on its merits as is required for proper exhaustion. *Woodford*, 548 U.S. at 90 (emphasis in original) (explaining that an inmate must use administrative remedies "*properly* (so that the agency addresses the issues on the merits)."). The record therefore establishes that Nelson failed to comply with 42 U.S.C. § 1997e(a) and his claims against Defendants Preston, Pennington, Russell, Perkins-Walker, and Geo are not properly exhausted. Accordingly, the Motion for Summary Judgment (ECF No. 39) will be GRANTED.

## V. Conclusion

Nelson's Motions regarding discovery from Defendants (ECF Nos. 27, 31, 34–36) will be DENIED. Nelson's Motion for an Extension of Time (ECF No. 58) will be GRANTED. The Motion for Summary Judgment (ECF No. 39) will be GRANTED. Claims 2, 5, and 6 will be DISMISSED WITHOUT PREJUDICE. Claim 3 against Preston and Pennington will be DISMISSED WITHOUT PREJUDICE. Claim 4 against Russell and Pennington will be DISMISSED WITHOUT PREJUDICE.

An appropriate Order will accompany this Memorandum Opinion.

Date: 3-21-2022
Richmond, Virginia

/s/ MHL
M. Hannah Lauck
United States District Judge

17