IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JAMES E. NELSON,

        Plaintiff,

v.                                       Civil Action No. 3:20cv803

L. ELLIS, *et al.*,

        Defendants.

## MEMORANDUM OPINION

James E. Nelson, a diabetic Virginia inmate proceeding *pro se*, filed this 42 U.S.C. § 1983 action.[1] The action proceeds on Nelson's Complaint. (ECF No. 1.) Nelson contends that, *inter alia*, the deliberate indifference of the defendants resulted in the loss of "3/4 of the first toe of his left foot by amputation" in violation of the Eighth Amendment.[2] (ECF No. 1, at 3.) Nelson names the following individuals as defendants: L. Ellis, a pharmacy nurse at Lawrenceville Correctional Center ("LVCC"); C. Harris, the Health Service Administrator for LVCC; Nurse N. Preston; Nurse Willoughby; Nurse B. Pennington; Nurse R. Jones; Head Nurse Sandra Lockhart;[3] B. Russell; Correctional Officer L. Perkins-Walker; and, Global Experts and Outsourcing, Inc. ("GEO"). (ECF No. 1, at 1.)

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system to the parties' submissions. The Court corrects the spelling, punctuation, and capitalization and omits the emphasis in quotations from the parties' submissions. The Court omits any secondary citations in the quotations from the parties' submissions.

[2] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

[3] Nurse Lockhart has changed her name to Rashea Mallory-Chatman. (ECF No. 71, at 1.) The Court employs Mallory-Chatman's current name for the remainder of the Memorandum Opinion. The Court notes that counsel occasionally misspells defendant's name as Mallory-Chapman. (*See, e.g.*, ECF No. 81, at 1.)

## I. Procedural History

In his Complaint, Nelson raised the following grounds for relief:[4]

| | |
|---|---|
| Claim 1 | L. Ellis failed to order the antibiotics ordered by Dr. Warner, which resulted in the amputation of a portion of Nelson's toe. (ECF No. 1, at 10–11.) |
| Claim 2 | GEO failed to warn Nelson in December of 2019 that the water at LVCC was unsafe. (*Id.* at 11–12.) "As a direct result of Nelson showering in contaminated water infecting the open chronic ulcer of the first toe of Nelson's left foot, caused ¾ [of the toe] to be amputated." (ECF No. 1, at 11–12.) |
| Claim 3 | Between November 8, 2019 and December 19, 2019, Harris, Preston, Willoughby, Pennington, and Jones ignored Nelson's requests to see the doctor which resulted in the amputation of a portion of his toe. (ECF No. 1, at 12–13.) |
| Claim 4 | Mallory-Chatman, Russell, and Pennington refused to provide Nelson with an adequate amount of gauze, which resulted in the amputation of a portion of Nelson's toe. (ECF No. 1, at 13–14.) |
| Claim 5 | After Dr. Warner directed that Nelson be transported to the Emergency Room on December 19, 2019, Perkins-Walker initially refused to comply with that directive because Nelson was not wearing the appropriate shoes. (ECF No. 1, at 7.) Perkins-Walker's action amounted to deliberate indifference to Nelson's medical needs. (ECF No. 1, at 15–16.) |
| Claim 6 | Since February of 2020, GEO has denied and delayed Nelson medical treatment by refusing to send Nelson to an orthopedic doctor "to have his diabetic boots corrected or changed." (ECF No. 1, at 17.) |

Nelson demands monetary damages. (ECF No. 1, at 23.)

### A. Prior Dismissals of Parties and Claims

On August 30, 2021, Defendants Preston, Pennington, Russell, Perkins-Walker, and GEO filed a Motion for Summary Judgment (the "2021 Motion for Summary Judgment"). (ECF No. 39.) By Memorandum Opinion and Order entered on March 21, 2022, the Court granted the

---

[4] It is appropriate to list all of the original claims here because they provide context for Defendants' argument that Nelson failed to properly exhaust his administrative remedies.

2021 Motion for Summary Judgment on the ground that Nelson failed to properly exhaust his administrative remedies (the "2022 Summary Judgment Decision"). (ECF Nos. 73, 74.)

By Memorandum Opinion and Order entered on February 3, 2023, the Court dismissed without prejudice all claims against Defendants Harris and Willoughby because Nelson failed to timely serve them. (ECF Nos. 115, 116.)

In the wake of the above decisions, the following claims, against the following Defendants, remain before the Court:

| | |
|---|---|
| Claim 1 | L. Ellis failed to order the antibiotics ordered by Dr. Warner, which resulted in the amputation of a portion of Nelson's toe. (ECF No. 1, at 10–11.) |
| Claim 3 | Between November 8, 2019 and December 19, 2019, Jones ignored Nelson's requests to see the doctor which resulted in the amputation of a portion of his toe. (ECF No. 1, at 12–13.) |
| Claim 4 | Mallory-Chatman refused to provide Nelson with an adequate amount of gauze, which resulted in the amputation of a portion of Nelson's toe. (ECF No. 1, at 13–14.) |

B. **Pending Matters**

Ellis, Mallory-Chatman, and Jones (collectively, "Defendants") have moved for summary judgment (the "Pending Motion for Summary Judgment"). (ECF No. 113.) As was the case in the 2021 Motion for Summary Judgment, Defendants argue that Nelson's claims against them should be dismissed because, *inter alia*, he failed to properly exhaust his administrative remedies. Nelson was provided with appropriate *Roseboro*[5] notice and has not responded.[6]

---

[5] *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975).

[6] The Court will consider the documents Nelson previously submitted with respect to the 2021 Motion for Summary Judgment.

3

Additionally, Nelson has filed a Motion to Reconsider the 2022 Summary Judgment Decision. (ECF No. 76.)

For the reasons set forth below, the Pending Motion for Summary Judgment will be GRANTED because Nelson failed to properly exhaust his administrative remedies. (ECF No. 113.) Furthermore, Nelson's Motion to Reconsider will be DENIED. (ECF No. 76.)

## II. Summary Judgment Standard

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility to inform the court of the basis for the motion, and to identify the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Id.* (quoting former Fed. R. Civ. P. 56(c) and 56(e) (1986)).

In reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a mere scintilla of evidence will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (citing *Improvement Co. v. Munson*, 81 U.S. 442, 448 (1872)). "[T]here is a preliminary

question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

Defendants ask the Court to dismiss Nelson's claims because Nelson failed to exhaust his administrative remedies as required by 42 U.S.C. § 1997e(a). Because the exhaustion of administrative remedies is an affirmative defense, Defendants bear the burden of pleading and proving lack of exhaustion. *Jones v. Bock*, 549 U.S. 199, 216 (2007). As pertinent here, Defendants submit: (1) Nelson's institutional record, including his grievance record and his medical record, (ECF Nos. 114-1, 114-2, 114-3, 114-4); (2) the declaration of Dr. Samuel Esochaghi, the Medical Director of LVCC, (ECF No. 114-5); (3) a copy of Operating Procedure 866.1–Offender Grievance Procedure, (ECF No. 114-6); and, (4) the declaration of Christy Jones, the acting Institutional Grievance Coordinator at LVCC, (ECF No. 114-7). Nelson previously submitted, among other things, several affidavits from himself and other inmates, (*see, e.g.*, ECF Nos. 1-2,[7] 1-3, 54-1, at 2–16), and grievance material, (ECF No. 1-4, at 1–11).

---

[7] Nelson swears that, "I have exhausted all administrative remedies . . . as required by the Prison Litigation Reform Act (PLRA)." (ECF No. 1-2, at 1.) However, Nelson's "[a]iry generalities [and] conclusory assertions" that he exhausted his administrative remedies "[do] not suffice to stave off summary judgment." *McManus v. Wilson*, No. 3:13CV460–HEH, 2015 WL 3444864, at *6 (E.D. Va. May 28, 2015) (alterations in original) (quoting *United States v. Roane*, 378 F.3d 382, 400–01 (4th Cir. 2004)).

5

In light of the foregoing principles and submissions, the following facts are established for the purposes of the Pending Motion for Summary Judgment. All permissible inferences are drawn in favor of Nelson.

### III. Relevant Facts

#### A. Background Regarding Nelson and His Medical Claims

"Nelson is a 68-year-old inmate who suffers from insulin dependent diabetes mellitus. Diabetic foot is a condition commonly experienced by persons suffering from diabetes, including Nelson." (ECF No. 114-5, at 1.)

> Diabetic foot compromises the body's ability to repair injury or trauma to the foot. . . . Vascular disease undermines the bodies' ability to heal itself. Consequently, it takes longer for a sore or cut to heal and the foot becomes especially susceptible to infection. Severe infection can lead to sepsis or gangrene.

(ECF No. 114-5, at 2.) "Diabetics are counseled to pay attention to and care for their feet to prevent foot infection." (ECF No. 114-5, at 2.) "Nelson has a long history of foot ulcers related to his diabetic condition." (ECF No. 114-5, at 2.)[8]

On November 6, 2019, Dr. Warner examined Nelson in conjunction with a chronic disease follow-up appointment. (ECF No. 114-5, at 3.) "Dr. Warner observed a large callus on Nelson's left first toe with an adjacent ulcer 1.5 x 1.5 cm in size. Dr. Warner noted that the ulcer was clean and was not draining. He noted that Nelson was keeping the ulcer dressed and clean." (ECF No. 114-5, at 3.) On November 7, 2019, Dr. Warner prescribed Nelson Thera Derm, which is a lotion, "not an antibiotic cream. This moisturizing lotion was not prescribed to treat

---

[8] Medical staff observed ulcers on Nelson toes on January 30, 2018, September 19, 2018, October 8, 2018, and April 15, 2019. (ECF No. 114–5, at 2.) These ulcers resolved by May 20, 2019. (ECF No. 114–5, at 3.)

cellulitis or infection but was instead prescribed as preventative therapy to promote skin integrity." (ECF No. 114-5, at 3.)[9]

"Insulin dependent diabetics like Nelson make daily visits to the LVCC medical department to receive insulin. Diabetic call is a busy time of day for the LVCC Nurses engaged in this process." (ECF No. 114-5, at 7.) During diabetic call, nurses are not available to address general health complaints and inmates voicing medical complaints "are frequently instructed to follow procedure by submitting a sick call request." (ECF No. 114-5, at 7.) Between November 8, 2019, and December 19, 2019, Nelson told the LVCC nurses that he needed to see a doctor because of an ulcer on his foot and he was repeatedly instructed to submit a sick call request. (ECF No. 1-3, at 2.) Nelson responded that he had submitted multiple sick call requests and had not received a response. (ECF No. 1-3, at 2.)[10]

Nelson was next seen in the medical department on December 19, 2019. (ECF No. 114-5, at 3.) Dr. Warner asked Nelson if he had received the antibiotics that had been prescribed on November 7, 2019. (ECF No. 1-3, at 3.) Nelson responded, "No." (ECF No. 1-3, at 3.) After a physical exam, "Dr. Warner ordered that Nelson be transported to the Community Memorial Hospital ("CMH") emergency room to receive intravenous antibiotics" for an infection of his toe. (ECF No. 114-5, at 3–4.)

> As of Dr. Warner's examination at 10:34 a.m., Nelson exhibited streaking associated with the systemic spread of Nelson's infection beyond his ulcerated toe. This is a disease process that manifests over days, not minutes or hours. At this

---

[9] Although Nelson received Thera Derm, it is unclear whether Dr. Warner prescribed antibiotics for Nelson on November 7, 2019, or whether Nelson received antibiotics immediately after November 7, 2019.

[10] According to Defendants' evidence, "[t]here is no record that Nelson submitted sick call requests that were simply ignored during November and December 2019." (ECF No. 114–5, at 7.)

> point, the disease process had advanced to a degree that Nelson's great toe amputation was likely inevitable.

(ECF No. 114-5, at 4.)

"At 11:00 a.m., Nurse Janifer contacted the CMH emergency room and LVCC transport officers to advise both cohorts of Nelson's impending transfer." (ECF No. 114-5, at 3–4.) Nevertheless, Nelson's departure from LVCC was delayed by Correctional Officer Perkins-Walker because Nelson was not wearing the appropriate shoes. (ECF No. 1-3, at 4.) Eventually, Captain Edwards allowed Nelson to leave LVCC despite his footwear. (ECF No. 1-3, at 5.)

Nelson's medical records do not reflect the exact time he arrived at CMH. (ECF No. 114-5, at 4.)

> However, his records reflect that his ulcerated great toe and blood was cultured sometime prior to 1:37 p.m. Without accounting for security protocols prior to transport, once the inmate is secured with the transport vehicle, the drive to CMH takes approximately 30 minutes.

(No. 114-5, at 4.) "The timing of Nelson's transportation to the CMH emergency room did not significantly affect the prognosis for his great toe." (No. 114-5, at 4.)

At CMH, Nelson was placed on intravenous antibiotics and his foot was x-rayed. (ECF No. 1-3, at 5.) Thereafter, Nelson's left great toe was amputated. (ECF No. 114-5, at 5.) On December 21, 2019, Nelson was discharged from CMH with a prescription for oral antibiotics. (ECF No. 114-5, at 5; ECF No. 1-3, at 5.)

### B. The Boil Water Advisory

On December 17, 2019, the Town of Lawrenceville and the North Brunswick Industrial Development Authority issued a boil water advisory (the "Advisory") to all residents in response to a repair of a water leak. (ECF No. 40-5, at 1–2.) In response to the Advisory, correctional

staff notified inmates at the LVCC of the Advisory and provided safe, "pouch water for drinking." (ECF No. 40-5, at 2.) The Advisory was lifted on December 19, 2019. (ECF No. 40-5, at 2.) "Fortunately, there was apparently no drinking water contamination resulting from this water leak and associated repairs." (ECF No. 40-5, at 3.)

### C. Grievance Procedure at the Virginia Department of Corrections ("VDOC")

Offenders receive an orientation to the grievance procedure system when they arrive at a VDOC facility. *See* Operating Procedure § 866.1.IV.A.4. Operating Procedure § 866.1 requires that, before submitting a formal grievance, the inmate must demonstrate that he or she has made a good faith effort to resolve the grievance informally through the procedures available at the institution to secure institutional services or resolve complaints. *See id.* at § 866.1.V.A. Generally, a good faith effort requires the inmate to submit an informal complaint form. *See id.* at § 866.1.V.A.1–2.

"The original *Regular Grievance* (no photocopies or carbon copies) should be submitted by the offender through the facility mail system to the Facility Unit Head's Office for processing by the Institutional Ombudsman/Grievance Coordinator." *See id.* at § 866.1.VI.A.2.b. The offender must attach to the regular grievance a copy of the informal complaint or other documentation demonstrating their attempt to informally resolve the issue. *Id.* at § 866.1.VI.A.2.a. Additionally, "[i]f 15 calendar days have expired from the date the *Informal Complaint* was logged without the offender receiving a response, the offender may submit a *Grievance* on the issue and attach the *Informal Complaint* receipt as documentation of the attempt to resolve the issue informally." *Id.* at § 866.1.V.A.3. A formal grievance must be filed within thirty days from the date of the incident or occurrence, or the discovery of the incident or occurrence, except in instances beyond the offender's control. *Id.* at § 866.1.VI.A.1.

### 1. Grievance Intake Procedure

Prior to review of the substance of a grievance, prison officials conduct an "intake" review of the grievance to assure that it meets the published criteria for acceptance. *Id.* at § 866.1.VI.B. For example, as pertinent here, "[o]nly one issue per grievance form will be addressed. The offender is to write the issue in the space provided on the *Regular* Grievance, preferably in ink." *Id.* at § 866.1VIA.2.a. A grievance meeting the criteria for acceptance is logged in on the day it is received, and a "Grievance Receipt" is issued to the inmate within two days. *Id.* at § 866.1.VI.B.3. If the grievance does not meet the criteria for acceptance, prison officials complete the "Intake" section of the grievance and return the grievance to the inmate within two working days. *Id.* at § 866.1.VI.B.4. If the inmate desires a review of the intake decision, he or she must send the grievance form to the Regional Ombudsman within five calendar days of receipt. *Id.* at § 866.1.VI.B.5. "If a Regular Grievance does not meet the criteria for acceptance and review by the Regional Ombudsman does not result in intake into the grievance process, the issue must be resubmitted in accordance with the criteria for acceptance." *Id.* at § 866.1.IV.O(b). Finally, "[t]he exhaustion of remedies requirement will be met only when the Regular Grievance has been accepted into the grievance process and appealed through the highest eligible level without satisfactory resolution of the issue." *Id.*

### 2. Grievance Appeals

Up to three levels of review exist for a regular grievance. *Id.* at § 866.1.VI.C. The Facility Unit Head of the facility in which the offender is confined is responsible for Level I review. *See id.* at § 866.1.VI.C.1. If the offender is dissatisfied with the determination at Level I, he or she may appeal the decision to Level II, which is conducted by the Regional Administrator, the Health Services Director, the Superintendent for Education, or the Chief of

Operations for Offender Management Services. *See id* at § 866.1.VI.C.2. The Level II response informs the offender whether he or she "qualifies for" an appeal to Level III. *Id.* at § 866.1.VI.C.2.g.

### D. <u>Nelson's Pertinent Efforts at Exhaustion with Respect to His Present Claim</u>

On December 27, 2019, Nelson filed five (5) informal complaint forms. (ECF No. 11-7, at 2; ECF No. 1-4, at 7–11.)[11] Nelson contends that this was a single complaint that stretched over five informal complaint forms. (ECF No. 65, at 15.) Because Nelson failed to receive a timely response to his informal complaint(s), on January 15, 2020, he filed a grievance pertaining to his medical care that stretched over three grievance complaint forms. (ECF No. 1-4, at 1, 3, 5.)[12] Nelson attempted to indicate that he was filing a single grievance by writing on the top of each form, "1 of 3," "2 of 3," and, "3 of 3." (ECF No. 1-4, at 1, 3, 5.)

On the first grievance form, Nelson stated:

> Because of deliberate indifference, gross negligence, wantoness and reckless endangerment to my health and safety by GEO, Inc., Nurse [Mallory-Chatman], Russell, Preston, Pennington, Willoughby, R. Jones, and Ellis, Pharmacy Nurse, caused me to lose 2/3 of my big toe on my left foot.

---

[11] The informal complaint forms in the record are largely illegible. (ECF No. 1–4, at 7–11.)

[12] On January 28, 2020, Health Services Manager Yarger issued a tardy response collectively to the informal complaint(s) as follows:

> I have reviewed your record. Our records indicate that you received 14 tabs of Bactrim DS for a seven-day regimen on 12/21/19. The day prior to writing this complaint, it appears as though the facility physician sent you to the local emergency room for treatment of your toe due to your condition diabetes. Our records indicate that you followed up with the physician on 1/17/20 and again on 1/21/20 for review and treatment. I will speak with nursing staff regarding the issuance of basic dressing supplies. Please let me know if this issue persists.

(ECF No. 114-7, at 2–3; ECF No. 114–1, at 1.)

> Ellis, Pharmacy Nurse, refused to order antibiotics Dr. Warner ordered. I am a diabetic and three times a day I asked the above nurses to see the doctor and for gauze and tape to wrap my toe. I also filed (3) requests to see the doctor.

(ECF No. 1-4, at 1.) On the second grievance form, Nelson stated,

> Nurse Russell went off on me, telling me she would not give me gauze and tape because [of] her boss, [Mallory-Chatman].
> Nurse Pennington only gave me a small piece of gauze and tape wrapped around a paper clip.
> November 19, 2019, after showering in water I later learned was contaminated, my big toe turned bright red and swollen and my ankle and leg were swollen. I showed this to Nurse Jones, who said come back the next day and she would be sure I saw the doctor. November 20, 2019, Dr. Warner asked if got the antibiotics he ordered from before. I told him, "No." Dr. Warner immediately sent me to the South Hill VCU. LVCC staff did not move fast enough and South Hill called wanting to know why I was not there.

(ECF No. 1-4, at 3.)[13] On the third grievance form, Nelson stated,

> At the hospital, I was immediately given antibiotics by IV. The doctor said it would take 10–12 days to possibly cure my toe that way, but he couldn't guarantee anything. The doctor said it was so bad and spread through my foot and leg, to save them I needed my toe amputated now.
> The combination of contaminated shower water, Ellis Pharmacy Nurse refusing to order antibiotics that Dr. Warner ordered, the nursing staff hindering and delaying me seeing the doctor and refusing to give me gauze and tape to keep the small place on my toe clean caused it to fester out of control which caused me to lose 2/3 of my big toe unnecessarily.
> This is a violation of Va. Const. Article 1, Section 9 and U.S. Const. 8th Amendment.
> I intend to prosecute.

(ECF No. 1-4, at 5.)

On January 27, 2020, Christy Jones, the Institutional Grievance Coordinator at LVCC, rejected each of the grievance forms at intake and marked on the back of each grievance form,

---

[13] The Court assumes Nelson's reference to November on the second grievance form is a scrivener's error and that he meant December. Nevertheless, this mistake certainly made it more difficult for prison officials to address his variety of complaints.

"More than one issue – resubmit with only one issue." (ECF No. 1-4, at 2, 4, 6.) "Nelson could have cured this problem by resubmitting a proper Regular Grievance." (ECF No. 114-7, at 3.)

Instead, Nelson attempted to appeal the intake decisions to the Regional Ombudsman. The appeal was stamped received in the Regional Ombudsman's Office on February 10, 2020. (ECF No. 114-7, at 1, 3, 5.) The Regional Ombudsman rejected the appeals because the "5 day time limit for review has been exceeded." (ECF No. 1-4, at 2, 4, 6.)

Nelson did not pursue any other grievances pertinent to the claims in this action, prior to the initiation of this action. (ECF No. 114-1, at 1–4.)

### IV. Exhaustion Analysis

The pertinent statute provides: "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This language "naturally requires a prisoner to exhaust the grievance procedures offered, whether or not the possible responses cover the specific relief the prisoner demands." *Booth v. Churner*, 532 U.S. 731, 738 (2001). Generally, in order to satisfy the exhaustion requirement, an aggrieved party must file a grievance raising the claim and pursue the grievance through all available levels of appeal, prior to bringing his or her action to court. *See Woodford v. Ngo*, 548 U.S. 81, 90 (2006). The Supreme Court has instructed that section 1997e(a) "requires proper exhaustion." *Id.* at 93. The Supreme Court explained that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules," *id.* at 90, "so that the agency addresses the issues on the merits." *Id.* (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). The applicable prison rules "define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007). Exhaustion is

mandatory, and courts lack discretion to waive the exhaustion requirement. *Porter v. Nussle*, 534 U.S. 516, 524 (2002).

Nevertheless "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (citing *Aquilar–Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006)). The Supreme Court has explained that an administrative remedy is considered unavailable when: (1) "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 578 U.S. 632, 643–44 (2016).

"When an administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion." *Id.* at 644. The United States Court of Appeals for the Seventh Circuit quoted the foregoing language to conclude that, when "refiling" an initially defective grievance, "was available to [an inmate, the inmate's] failure to exhaust is not excusable." *Haywood v. Baylor*, 804 F. App'x 401, 403 (7th Cir. 2020) (citing *Kaba*, 458 F.3d at 684); *accord Wall v. Stevens*, No. 7:16–CV–00373, 2019 WL 1371858, at *4 (W.D. Va. Mar. 26, 2019), *aff'd*, 775 F. App'x 761 (4th Cir. 2019); *see Woodford*, 548 U.S. at 90 (emphasis added) (internal quotation marks omitted) (emphasizing that proper exhaustion entails "using *all* steps that the agency holds out"); *Wilson v. Jamrog*, No. 98–2281, 2000 WL 145455, at *2 (6th Cir. Feb. 1, 2000).

Nelson failed to comply with the VDOC's procedural rules for the grievance he filed with respect to Defendants. Those rules required that Nelson limit himself to a single issue per grievance. This follows settled procedural requirements. *See Moore*, 517 F.3d at 729.[14] Moreover, it is not possible to characterize the rejection of his multipage grievance complaining about, *inter alia*, contaminated shower water, inadequate provision of gauze, missed prescriptions, and a delay in transport to the hospital, as an inappropriate effort by "prison administrators [to] thwart [Nelson] from taking advantage of a grievance process through machination . . . ." *Ross*, 578 U.S. at 644 (citation omitted).

Admittedly, this seems a harsh result for Nelson, who has lost a portion of his foot, possibly—at least in part—because of the indifference of prison officials. Nevertheless, one

---

[14] In *Moore*, the inmate disputed the conclusion that he had not properly exhausted his claim for inadequate medical care for his gout. 517 F.3d at 729. Moore had filed a grievance that referenced his gout, but it also referenced several other incidents and was rejected. *Id.* The Fourth Circuit, concluded that the rejection of that grievance did not render administrative remedies unavailable to Moore. *Id.* In reaching that conclusion, the Fourth Circuit observed:

> Moore's first gout grievance also contained, *inter alia*, a complaint that a nurse attempted to use a prison officer to collect a urine sample that was to be analyzed for a regular physical examination. The grievance requested that the prison consider all of the facts alleged therein to be a single incident showing a pattern of inadequate medical care fueled by retaliatory motives. Indeed, Moore now argues that because he wasn't allowed to include the two complaints in the same grievance, he was prevented from showing a pattern of deliberate indifference. Simply stated, though, it is hard to see how Moore's claim that a nurse attempted to have an officer collect a urine sample has anything to do with a possible pattern of deliberate indifference toward Moore's medical needs. Thus, we conclude that the rejection of the grievance as violating the rule prohibiting a single grievance from being used to complain of two separate incidents certainly was well founded.

*Id.*; *but see id.* at 730 (concluding prison authorities improperly rejected grievance for referencing multiple incidents of retaliatory punishment because "requiring Moore to grieve each of the alleged components of his punishment separately would have prevented him from fairly presenting his claim in its entirety").

15

must remember that part of the purpose of the exhaustion requirement is to "afford[] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case. In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation." *Porter v. Nussle*, 534 U.S. 516, 525 (2002) (emphasis added) (citing *Booth*, 532 U.S. at 737). To that end, the VDOC grievance procedure requires that a formal grievance must be filed within thirty days from the date of the incident or occurrence. Operating Procedure § 866.1.VI.A.1. This requirement encourages the inmate to promptly pursue a grievance with respect to each, individual, offending incident so that corrective action may be taken.

Here, according to Nelson, from November 8, 2019 and throughout the rest of November 2019, he submitted multiple sick call requests to see a doctor that were simply ignored. (ECF No. 1-3, at 2.) If Nelson had promptly pursued a grievance with respect to each disregarded request, his access to medical care could have been accelerated. Instead, Nelson waited until January 15, 2020, after he had lost a portion of his foot, to file his multi-issue grievance and raise the issue that nursing staff had hindered his access to the doctor in November of 2019. (ECF No. 1-4, at 1, 5.)

Further, the rejection of Nelson's grievance did not render the administrative process unavailable because Nelson had ample opportunity, and was in fact encouraged, to resubmit separate grievances addressed to each of the incidents of which he now complains. *See Haywood*, 804 F. App'x at 403 (citing *Kaba*, 458 F.3d at 684). Because he failed to do so, his complaint was not addressed on its merits as is required for proper exhaustion. *Woodford*, 548 U.S. at 90 (emphasis in original) (explaining that an inmate must use administrative remedies "*properly* (so that the agency addresses the issues on the merits)."). The record therefore

16

establishes that Nelson failed to comply with 42 U.S.C. § 1997e(a) and his claims against Defendants are not properly exhausted.

## V. Motion for Reconsideration

In the 2022 Summary Judgment Decision, the Court granted summary judgment to Defendants Preston, Pennington, Russell, Perkins-Walker, and GEO on the grounds that Nelson had not properly exhausted his administrative remedies with respect to his claims against them. The Court's reasoning was largely identical to that set forth above with respect to the Pending Motion for Summary Judgment. In his Motion for Reconsideration, Nelson seek reconsideration of the of the 2022 Summary Judgment Decision. Nelson initially asserts that he is not required to exhaust his available administrative remedies. (ECF No. 77, at 2.) Nelson cites no persuasive authority for that proposition, and it lacks merit. *See* 42 U.S.C. § 1997e(a).

Next, Nelson insists that he exhausted his administrative remedies by the submission of multiple issues on a single grievance. This argument lacks merits for the reasons set forth above. To the extent Nelson suggests that he properly exhausted his administrative remedies merely because he appealed the intake decision to the Regional Ombudsman, he is wrong.

> A regular grievance's rejection at intake, even if appealed, does not constitute exhaustion. *Jackson v. Barksdale*, 2017 WL 3446259 at *5 (W.D. Va. Aug. 10, 2017) (Sargent, M.J.) ("[S]uch final intake decisions do not constitute[] exhaustion of administrative remedies."), *aff'd*, 707 F. App'x 786 (4th Cir. 2018); *Hailey v. Clary*, 2018 WL 2123623 at *2 (W.D. Va. May 8, 2018) (Urbanski, C.J.). In order to satisfy the exhaustion requirement, an inmate must correct and resubmit the grievance, have it accepted, and then appeal it to the highest available level of review without satisfactory resolution of the issue. *Jackson*, 2017 WL 3446259 at *5.

*Person v. Davis*, No. 7:20-CV-00146, 2021 WL 4429194, at *4 (W.D. Va. Sept. 27, 2021) (first alteration in original) (some citations corrected). Accordingly, Nelson's Motion for

Reconsideration will be DENIED. (ECF No. 76.) Nelson's Motion to Deny Defendants' Motion in Opposition to Nelson's Motion for Reconsideration will be DENIED. (ECF No. 87.)

### VI. Conclusion

Nelson's Motion for Reconsideration will be DENIED. (ECF No. 76.) Nelson's Motion to Deny Defendants' Motion in Opposition to Nelson's Motion for Reconsideration will be DENIED. (ECF No. 87.) Defendants' Pending Motion for Summary Judgment will be GRANTED. (ECF No. 113.) Nelson's claims and the action will be DISMISSED.

An appropriate Final Order will accompany this Memorandum Opinion.

Date: 2/24/2023  
Richmond, Virginia

/s/ M. Hannah Lauck  
United States District Judge